UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————
                                              )
CELTIC WOMAN LTD.,                            )
                                              )
        Plaintiff,                            )
                                              )
v.                                            )        Civil Action No. 08-CV-0066
                                              )
CELTIC THUNDER LTD.,                          )
CELTIC MAN LTD., SHARON                       )
BROWNE, WLIW LLC,                             )
ALIGN ENTERTAINMENT GROUP LLC, )
and GUSTAVO SAGASTUME,                        )
                                              )
        Defendants.                           )
—————————————————————

## PLAINTIFF CELTIC WOMAN LTD.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
## PRELIMINARY INJUNCTION AGAINST DEFENDANT WLIW LLC

Peter A. Herbert (PH-2581)
Deborah L. Benson
Eric D. Levin
Amy B. Spagnole
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA 02109
Tel: (617) 345-9000

Richard S. Mandel (RM-4884)
Cowan, Liebowitz & Latman, P.C.
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 790-9200

*Attorneys for Plaintiff Celtic Woman Ltd.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS ................................................................................... 4

I.      Plaintiff's CELTIC WOMAN Show ....................................................... 4

II.     Plaintiff's Acquisition of CELTIC WOMAN and CELTIC MAN ..................... 5

III.    Plaintiff's Development and Marketing of the CELTIC WOMAN Show ................ 6

IV.     Plaintiff's Registration of the CELTIC WOMAN Trademark ............................ 8

V.      Plaintiff's Use of CELTIC WOMAN on the Internet ..................................... 9

VI.     Plaintiff's Steps to Develop and Protect CELTIC MAN ................................ 9

VII.    Defendants' Infringing Use of CELTIC WOMAN and CELTIC MAN ................. 10

ARGUMENT ................................................................................................... 17

I.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADEMARK
        INFRINGEMENT CLAIMS BASED ON DEFENDANTS' USE OF "CELTIC MAN" ...
        ............................................................................................................. 19

        A.      Plaintiff's CELTIC WOMAN Mark is Entitled to Trademark Protection ........... 19

        B.      There is a Strong Likelihood of Confusion Between Plaintiff's CELTIC WOMAN
                Mark and Defendants' CELTIC MAN mark ........................................... 20

                1.      Plaintiff's CELTIC WOMAN Mark is Strong ................................ 21

                2.      Plaintiff's CELTIC WOMAN Mark and Defendants' CELTIC MAN Mark
                        are Virtually Identical ....................................................... 22

                3.      The Parties' Goods and Services are Related and Sold Through the
                        Same Channels of Trade .................................................... 23

                4.      Plaintiff Already Has Bridged the Gap .................................... 24

                5.      There is Substantial Evidence of Actual Confusion ...................... 25

                6.      Defendants Adopted the CELTIC MAN Mark in Bad Faith ............... 26

7.  The Quality of Defendants' Products is Outside Plaintiff's Control.........28

8.  Sophisticated and Unsophisticated Buyers are Likely to be Deceived .....28

9.  A Likelihood of Confusion Exists Based on the Polaroid Factors and Clear Precedent ..........................................................................................................29

II.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADEMARK INFRINGEMENT CLAIMS BASED ON DEFENDANTS' UNAUTHORIZED USE OF PLAINTIFF'S "CELTIC WOMAN" TRADEMARK TO PROMOTE THEIR "CELTIC MAN" SHOW ..........................................................................................................31

III.  PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS DENIED ..........................................................................................................32

IV.  THE BALANCE OF HARDSHIPS WEIGH HEAVILY IN FAVOR OF THE PLAINTIFF ..........................................................................................................33

CONCLUSION ..........................................................................................................35

#717019v2

# TABLE OF AUTHORITIES

## Statutes

15 U.S.C § 1057(b) ...............................................................................................19

15 U.S.C. § 1114 ....................................................................................19, 22, 32

15 U.S.C. § 1125(a) ...............................................................................19, 22, 32

## Cases

Adjusters Int'l, Inc. v. Public Adjusters Int'l, Inc., 92-CV-1426, 1996 WL 492905 (N.D.N.Y. Aug. 27, 1996) ...............................................................................20, 27

American Home Prods. Corp. v. Johnson Chemical Co., 589 F.2d 103 (2d Cir. 1978) .........21, 32

Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486 (2d Cir. 1988) ...............................23, 24

Bear U.S.A., Inc. v. Kim, 71 F. Supp. 2d 237 (S.D.N.Y. 1999) ....................................................27

Boston Athletic Ass'n v. Sullivan, 867 F.2d 22 (2d Cir. 1980) ....................................................34

Brother Records, Inc. v Jardin, 318 F.3d 900 (9th Cir. 2005).............................................. 31-32

Foxworthy v. Custom Tees, Inc., 879 F. Supp. 1200 (N.D. Ga. 1995) ..........................................18

Groytrian, Helfferich, Schulz Th. Steinweg Nachf. v. Steinway & Sons, 365 F.Supp. 707, (S.D.N.Y. 1973), aff'd, 523 F.2d 1331 (2d Cir. 1975) ...............................................................25

Gruner + Jahr USA Pub'g, A Division of Gruner + Jahr Printing and Pub'g Co. v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993) ........................................................................................19

Harlequin Enters. Ltd. v. Gulf & W. Corp., 644 F.2d 946 (2d Cir. 1981) ....................................27

Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097 (2d Cir. 1969)...................28

Lambda Elec. Corp. v. Lambda Tech. Inc., 211 U.S.P.Q. 75 (S.D.N.Y. 1981) ............................25

Laureyssens v. Idea Group, Inc., 964 F.2d 131 (2d Cir. 1992) .....................................................18

Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2d Cir. 1956) ....................25

McDonalds Corp. v. Robertson, 147 F.3d 1301 (11th Cir. 1998) .................................................18

Miss Universe, Inc. v. Little Miss USA, Inc., 212 U.S.P.Q. 425 (N.D. Ga. 1981) .................23, 31

Miss Universe, Inc. v. Miss Teen USA, Inc., 209 U.S.P.Q. 698 (N.D. Ga. 1980)...................23, 30

Miss Universe, Inc. v. Pitts, 714 F. Supp. 209 (W.D. La. 1989)......................................23, 29, 30

Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254 (2d Cir. 1987) ................................27

Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44 (2d Cir. 1978)...................................20

Paddington Corp. v. Attiki Imp. & Distrib's, Inc., 996 F.2d 577 (2d Cir. 1993)....................21, 27

Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961) ...................................20

Power Test Petroleum Distributors v. Calcu Gas, 754 F.2d 91 (2d Cir. 1985).......................28, 33

Schweitzz Dist. Co. v. P & K Trading, Inc., No. 93 CV 4785(NG), 1998 WL 472505
(E.D.N.Y. July 16, 1998)...................................................................................................................27

Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704 (2d Cir. 1982) ...............32

Virgin Enterprises Ltd. v. Nawb, 335 F.3d 141 (2d Cir. 2003)..................................19, 21, 22, 25

W.E. Bassett Co. v. Revlon, Inc., 305 F. Supp. 581 (S.D.N.Y. 1969) ...........................................27

Yale Elec. Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928) ...........................................................29

#717019v2

Plaintiff Celtic Woman Ltd. submits this memorandum in support of its motion for a preliminary injunction enjoining Defendant WLIW LLC ("WLIW") and those acting in concert with it from using the trademark and trade name CELTIC MAN and the trademark and trade name CELTIC WOMAN in connection with a scheduled PBS television broadcast in March 2008, as more particularly described herein.

## **INTRODUCTION**

Plaintiff Celtic Woman Ltd. is the owner and producer of the highly acclaimed and internationally recognized musical stage production "CELTIC WOMAN" and related musical sound recordings and DVDs. The production features five female artists performing a mix of traditional, classical, theatrical and popular music in a large theatrical setting that includes an orchestra, choral singers, and highly professional and complex stage and lighting designs. The scale and theatrical elegance of this complex presentation distinguishes the CELTIC WOMAN production from the casual intimate venues of most vocal performances of traditional Irish music.

In July 2004, Plaintiff acquired all rights to the names, concepts, and properties of CELTIC WOMAN and the extension concept CELTIC MAN from Defendant Sharon Browne through the acquisition of her company, and Browne became an employee of Plaintiff's affiliate at that time. During the period of Browne's employment from 2004 through the end of 2006, the CELTIC WOMAN production achieved widespread popularity in the United States with the release of music CDs and related DVDs that have sold several million copies in the United States alone, television specials broadcast thousands of times by hundreds of Public Broadcasting System ("PBS") stations throughout the United States, six tours in the United States with ticket sales approximating 600,000 in number, sales of merchandise, and a highly popular Internet website. The trademark CELTIC WOMAN is registered in the United States on the Principal

1

Register. It is recognized by millions of people and has achieved exceptional fame and secondary meaning.

Following the expiration of Defendant Browne's term of employment at the end of 2006, she began to develop a replica of Plaintiff's CELTIC WOMAN production in a male format with the virtually identical name "CELTIC MAN." The CELTIC MAN production features five male artists performing a mix of traditional and popular music in a large theatrical setting with an orchestra, choral singers, and complex stage and lighting designs. In collaboration with the other Defendants,[1] Defendant Browne is marketing the CELTIC MAN show to the same network of PBS stations in the United States and general consumers who have become the heart of the market for the CELTIC WOMAN show. Defendant WLIW, an independent PBS station, is scheduled to broadcast the debut recorded performance of CELTIC MAN in March 2008. Like the CELTIC WOMAN show, the CELTIC MAN show will be accompanied by the distribution of CDs and DVDs, tours, and the sale of related merchandise.

CELTIC MAN looks and sounds like Plaintiff's registered trademark CELTIC WOMAN and is its gender counterpart. Defendants' use of CELTIC MAN in connection with a musical production that replicates the unusual format of the CELTIC WOMAN production, and targets the same audience and market as the CELTIC WOMAN production, has already caused enormous *actual confusion* among many of the PBS stations that previously broadcast the CELTIC WOMAN production. Actual confusion is further made inevitable among consumers as a result of Defendants' prominent use of Plaintiff's famous CELTIC WOMAN trademark to promote their CELTIC MAN show.

---

[1] Defendants are WLIW, Sharon Browne, Celtic Man Ltd., Celtic Thunder Ltd., Align Entertainment Group LLC and Gustavo Sagastume (collectively, "Defendants").

#717019v2

Defendants' trademark infringement and unfair competition is willful and in bad faith. Defendant Browne has at all times known that CELTIC WOMAN and CELTIC MAN are names, concepts, and properties that she sold to Plaintiff's affiliate in 2004, and that are now owned by Plaintiff. Moreover, Defendants Browne and Gustavo Sagastume formerly worked closely with Plaintiff to promote the CELTIC WOMAN production, and thus have intimate knowledge of the fame and importance of the CELTIC WOMAN mark. Defendants are intentionally trading off the name and reputation of CELTIC WOMAN, attempting to create a false association as a platform from which to launch the debut performance of the CELTIC MAN show in the United States and to ride on the coattails of the established goodwill and reputation of CELTIC WOMAN.

Plaintiff is suffering and will continue suffer irreparable harm as a result of Defendants' misconduct. In particular, this harm is being inflicted by Defendants' wrongful use of Plaintiff's own property rights and, most importantly, its loss of control over the reputation and goodwill associated with the CELTIC WOMAN mark. Conversely, Defendants are not harmed by being deprived of an unlawful benefit to which they are not legally entitled. As importantly, the entertainment industry and the public at large should be protected this fraudulent deception that misleads consumers into believing that the CELTIC MAN show is produced, sponsored or otherwise associated with the highly acclaimed CELTIC WOMAN production. Accordingly, Defendant WLIW should be restrained from the use of CELTIC MAN and CELTIC WOMAN in connection with the upcoming television broadcast of its show.[2]

---

[2] Defendant WLIW has been served with the Complaint and Summons. Defendants Sharon Browne, Celtic Man Ltd. and Celtic Thunder Ltd. are located in Ireland. Plaintiff is in the process of serving them with the Complaint and Summonses under the Hague Convention. In the meantime, Plaintiff has provided a courtesy copy of the Complaint and Summonses to their attorneys in Ireland. Plaintiff has not been able to locate an address for Defendant Gustavo Sagastume. Plaintiff has an address for Align Entertainment Group LLC, and has attempted service at that address on several occasions, but has not been successful. Plaintiff is continuing its efforts to serve the Defendants other than WLIW. See Declaration of Peter Herbert executed on January 9, 2008 submitted

3

## STATEMENT OF FACTS

I.    **Plaintiff's CELTIC WOMAN Show**

Plaintiff Celtic Woman Ltd. is a company based in Ireland that owns the musical stage

production CELTIC WOMAN. The CELTIC WOMAN show features five female artists

performing a mix of traditional, classical, theatrical and popular music. Unlike most Celtic

bands that typically perform in an intimate pub setting, the CELTIC WOMAN show is

performed in a large theatrical setting with an orchestra, choral singers, and highly professional

and complex stage and lighting designs. Declaration of David Kavanagh ("Kavanagh Decl."), ¶

2. Copies of DVDs of the CELTIC WOMAN show are annexed to the Kavanagh Decl. as Exs.

4-6.[3]

The CELTIC WOMAN production has achieved enormous acclaim and popularity in the

United States and elsewhere through its CDs, DVDs, tours, and television broadcasts. Numerous

CELTIC WOMAN recorded performances have been released as albums on CDs and in

audiovisual format on DVDs, including: *Celtic Woman, Celtic Woman: A Christmas Celebration*

and *Celtic Woman: A New Journey*. Kavanagh Decl., Exs. 1-6. These CELTIC WOMAN CDs

have sold in excess of 2.3 million copies and the related DVDs have sold over 750,000 copies in

the United States alone. Kavanagh Decl., ¶¶ 3-4.

---

herewith. Because the other Defendants have not been served officially (although Browne, Celtic Man Ltd. and
Celtic Thunder Ltd. were provided with courtesy copies through their Ireland counsel), Plaintiff has brought this
motion solely against Defendant WLIW. Plaintiff will file a similar motion with respect to the other Defendants
once service of process has been achieved.

[3] All exhibits cited herein are attached to the Declaration of David Kavanagh, who is the Chief Executive
Officer and largest shareholder of Plaintiff Celtic Woman Ltd. Kavanagh also is the Chief Executive Officer and
sole owner of Liffey Records Ltd. ("Liffey Records"), a record company based in Ireland that formerly owned the
rights to CELTIC WOMAN through its wholly-owned subsidiary Celtic Collections Ltd. before assigning those
rights to the Plaintiff. See discussion § II, infra.

4

**II.    Plaintiff's Acquisition of CELTIC WOMAN and CELTIC MAN**

In 2003, Celtic Collections Ltd., a record label then owned by Defendant Sharon Browne and Declan Browne (sometimes collectively referred to as the "Brownes"), designed the concept of CELTIC WOMAN as a means to promote some of the female recording artists signed to its label. Thus, at the time, CELTIC WOMAN was merely the name given to a compilation of recorded solo performances of musical compositions by various female artists. Kavanagh Decl., ¶ 6. At the same time, Celtic Collections Ltd. had conceived of the companion concept CELTIC MAN as a natural extension of CELTIC WOMAN, and reserved it for future development and exploitation. Kavanagh Decl., Ex. 7 (Sharon Browne's "MySpace" Profile).

On July 27, 2004, Liffey Records, a company owned by David Kavanagh ("Kavanagh"), the CEO and largest shareholder of Plaintiff Celtic Woman Ltd., purchased from the Brownes for 850,000 Euros (the 2004 equivalent of $1,036,237.11 US dollars) all shares of Celtic Collections Ltd. A copy of the Stock Purchase Agreement is annexed to the Kavanagh Decl. as Ex. 8. This acquisition included all intellectual property rights in the names and concepts CELTIC WOMAN and CELTIC MAN. Kavanagh Decl., ¶ 7.

In conjunction with the acquisition, Defendant Browne continued as an employee of Celtic Collections Ltd. at the direction of its CEO Kavanagh and within the ownership of Liffey Records. Browne remained an employee of Celtic Collections Ltd. until December 31, 2006, by which time CELTIC WOMAN had developed enormous success and popularity in the United States. During the term of her employment with Celtic Collections Ltd., Browne worked on the development and marketing of the CELTIC WOMAN show with a team of producers, composers, performers, and promoters. Kavanagh Decl., ¶ 8.

#717019v2

**III.    Plaintiff's Development and Marketing of the CELTIC WOMAN Show**

On September 15, 2004, under the auspices of Liffey Records, the first CELTIC

WOMAN stage show was filmed for PBS television at The Helix Theater in Dublin, Ireland to a

capacity audience. Kavanagh Decl., ¶ 13.

On January 4, 2005, Liffey Records and Celtic Collections Ltd. assigned all the rights in

the CELTIC WOMAN production to Plaintiff Celtic Woman Ltd., a company formed by

Kavanagh specifically for the purpose of developing and marketing CELTIC WOMAN.

Kavanagh Decl., ¶ 14.

On March 1, 2005, the CELTIC WOMAN debut album entitled *Celtic Woman* was

released on CD and DVD through EMI Music's "Manhattan Records" label. Kavanagh Decl.,

Exs. 1, 4. *Celtic Woman* reached number one on Billboard's World Music Chart, eventually

breaking a long-standing record on July 22, 2006 by staying at number one for 68 weeks, and

held the number one position on the World Music Chart for a total of 81 weeks. *Celtic Woman*

has gone platinum in the U.S. (selling over one million copies). Kavanagh Decl., ¶¶ 3, 15.

Also in March 2005, the CELTIC WOMAN stage production recorded at The Helix

Theater in September 2004 was broadcast on numerous PBS stations throughout the United

States. Kavanagh Decl., ¶ 16. This PBS Special has aired over 3,400 times on 316 different

PBS stations since its debut. Kavanagh Decl., ¶ 24.

On October 19, 2006, CELTIC WOMAN released its second album entitled *Celtic*

*Woman: A Christmas Celebration.* Kavanagh Decl., ¶ 19; Ex. 2. This album debuted at number

one on the World Music Chart, bumping the first CELTIC WOMAN album to number two on

the chart. *Celtic Woman: A Christmas Celebration* has attained gold status in the U.S. (selling

over 500,000 copies). Kavanagh Decl., ¶¶ 3, 19, 22.

6

On December 6, 2006, with more than 90% of all 330 PBS stations in the United States broadcasting during PBS's December 2006 pledge period, the premiere of the CELTIC WOMAN show entitled *Celtic Woman: A New Journey: Live at Slane Castle,* that was previously filmed at Slane Castle on the banks of the Boyne River set fundraising records for the PBS stations.   Kavanagh Decl., ¶ 20.

On January 30, 2007, CELTIC WOMAN released a third album entitled *Celtic Woman: A New Journey* that debuted at number one on the World Music Chart and number four on the Billboard Top 200 Music Chart.  Kavanagh Decl., ¶¶ 3, 21-22, Ex. 3.  Like its predecessors, this album attained gold status in the U.S. (selling over 500,000 copies).  Kavanagh Decl. ¶¶ 3, 21-22.

From the Summer of 2005 through the Fall of 2007, there were six successful CELTIC WOMAN tours in the United States, which have sold out venues such as New York's Radio City Music Hall and Carnegie Hall, Boston's Opera House, and Los Angeles' Greek Theatre.  Total ticket sales for these U.S. tours are approximately 600,000.  Declaration of Jonathan Hochwald ("Hochwald Decl."), ¶ 11.[4]

The performers in the CELTIC WOMAN show have appeared on many television shows with nationwide audiences such as *The Today Show*, *Live with Regis & Kelly*, *The Megan Mullaly Show*, *The Martha Stewart Show* and *Brian Boitano's NBC Skating Spectacular on New Year's Day 2007*.  Additionally, on March 17, 2007, the CELTIC WOMAN show was performed at the White House for President Bush and his guests at a St. Patrick's Day celebration. Kavanagh Decl., ¶¶ 25-26.

---

[4] Jonathan Hochwald is the President of Madstone Productions, which is the North American Tour Promoter for CELTIC WOMAN.  Madstone also negotiates contracts with PBS television stations for the broadcast of CELTIC WOMAN filmed shows and the providing of tickets to live performances of CELTIC WOMAN for distribution as part of PBS pledge drives.  Hochwald Decl., ¶¶ 3, 6.

7

As described above, Celtic Woman Ltd.'s registered trademark CELTIC WOMAN is recognized by millions of people and has achieved fame and secondary meaning in the United States as a source of high quality and unique entertainment. The enormous success of CELTIC WOMAN was achieved through a huge expenditure of time and money by Celtic Woman Ltd., which has spent approximately $10 million to produce and promote CELTIC WOMAN tours, television broadcasts, CDs, DVDs, and merchandise. Kavanagh Decl., ¶ 31. The popularity of CELTIC WOMAN in the United States also is due in substantial part to the national exposure it received each year through PBS broadcasts, where CELTIC WOMAN set fundraising records for pledge drives and developed a national following. Kavanagh Decl., ¶ 32; Hochwald Decl., ¶ 13. Celtic Woman Ltd. continues to promote CELTIC WOMAN with tours currently planned throughout the Western Europe and new recordings being prepared for release. Kavanagh Decl., ¶ 33.

## IV.    Plaintiff's Registration of the CELTIC WOMAN Trademark

Plaintiff Celtic Woman Ltd. owns the following United States trademark registrations issued on the Principal Register:

| Mark | Reg. No. | Reg. Date | Goods |
|------|----------|-----------|-------|
| CELTIC WOMAN | 3,290,299 | 9/11/2007 | Series of musical sound recordings and prerecorded compact discs, videotapes, CD-ROMs, DVSs, all featuring music and/or dance; downloadable audio and video recordings featuring music and/or dance. |
| CELTIC WOMAN | 3,290,300 | 9/11/2007 | Printed matter, paper and stationery products, namely, posters, poster books, calendars, concert souvenir programs, stickers, bumper stickers, decals, postcards, picture postcards, stationery, photographs, printed paper signs, and tickets. |

8

| CELTIC WOMAN | 3,306,488 | 10/9/2007 | Clothing, namely, shirts, polo shirts, T-shirts, athletic uniforms, tops, sweat pants, jackets, caps, hats, aprons, scarves, singlets, socks, loungewear. |
|---|---|---|---|

Kavanagh Decl., Exs. 9, 10, 11.

## V.    Plaintiff's Use of CELTIC WOMAN on the Internet

CELTIC WOMAN has an active presence on the Internet.  Celtic Woman Ltd. acquired the <celticwoman.com> domain name and has operated a website at this Internet address since at least as early as March 2005.  The CELTIC WOMAN name and mark is and has been for years prominently featured on Celtic Woman Ltd.'s website.  Celtic Woman Ltd. uses its CELTIC WOMAN website to advertise and promote CELTIC WOMAN CDs and DVDs and to provide information about upcoming appearances, concerts and tours.  The website also provides information about CELTIC WOMAN performers and permits consumers to purchase CELTIC WOMAN branded products such as concert programs, t-shirts, coffee mugs, key chains, posters, paperweights, bookmarks, and other related merchandise.  Kavanagh Decl., ¶¶ 27, 29.

The CELTIC WOMAN branded website receives an average of 35,000 to 42,000 hits per week, and had 215,920 visitors and 1,427,950 "pageviews" in December 2007 alone.  To date, Celtic Woman Ltd. has sold over 4,500 items of CELTIC WOMAN branded merchandise to consumers in the United States through its <celticwoman.com> website.  These sales do not include sales of CELTIC WOMAN branded merchandise during CELTIC WOMAN tours or through other channels of trade.  Kavanagh Decl., ¶¶ 28, 30.

## VI.    Plaintiff's Steps to Develop and Protect CELTIC MAN

In 2005, Plaintiff Celtic Woman Ltd. began to consider the future development and commercial exploitation of the CELTIC MAN concept.  To that end, Kavanagh, the CEO of

9

Celtic Woman Ltd., had several discussions with Defendant Browne, then an employee of Celtic Collections Ltd., regarding CELTIC MAN. Additionally, Kavanagh met with members of EMI Music to discuss CELTIC MAN. Browne was present at this meeting in her capacity as an employee of Celtic Collections Ltd. Kavanagh Decl., ¶ 17. In these discussions and meetings, it was consistently determined that the CELTIC MAN name and concept would not be developed by Plaintiff until the CELTIC WOMAN production had been widely accepted by the general public.

Thereafter, on May 26, 2006 and November 2, 2006, respectively, Celtic Woman Ltd. obtained registrations for the domain names <celticman.eu> and <celticman.com> in contemplation of producing a stage show by this name in the future after CELTIC WOMAN had been firmly established. Kavanagh Decl., ¶ 17. Additionally, on May 3, 2007, Celtic Woman Ltd. filed four United States trademark applications for the mark CELTIC MAN with the United States Patent and Trademark Office, which have been blocked by the prior applications of Defendant Browne for the same mark. Kavanagh Decl., ¶ 36.

## VII.    Defendants' Infringing Use of CELTIC WOMAN and CELTIC MAN

Defendant Sharon Browne and her collaborators have replicated Plaintiff's CELTIC WOMAN production in a masculine format and are marketing it under the virtually identical name CELTIC MAN. Just like the unusual format of the CELTIC WOMAN show, Defendants' CELTIC MAN show features five male artists performing a mix of traditional and popular music in a large theatrical setting with an orchestra, choral singers, and complex stage and lighting designs. Both shows are within the same narrow musical genre. Kavanagh Decl., ¶ 10; Hochwald Decl., ¶ 19. Defendants' CELTIC MAN show not only replicates the CELTIC WOMAN stage production, but misappropriates the CELTIC MAN name and concept that Plaintiff's affiliate, Liffey Records, acquired from Defendant Browne when it purchased Celtic

#717019v2

Collections Ltd. in 2004 and which Browne, as an employee of Celtic Collections Ltd., knew was a name and concept that Celtic Woman Ltd. was reserving for potential development in the future. Kavanagh Decl. ¶¶ 7, 17. A copy of a promotional DVD video of CELTIC MAN is annexed to the Kavanagh Decl. as Ex. 23.

Defendants are using the confusingly similar name CELTIC MAN to identify their show. In addition to the similarity in appearance and sound, there is a close inherent association between the names CELTIC WOMAN and CELTIC MAN as they each represent a counterpart gender and natural extension of the other. Moreover, Defendants also are using Plaintiff's trademark CELTIC WOMAN prominently and deceptively in promotional materials for the CELTIC MAN show to mislead the public into believing that the CELTIC MAN show originates with or is sponsored by CELTIC WOMAN. Kavanagh Decl., ¶ 53, Ex. 23. Hochwald Decl., ¶ 20. These actions have caused widespread actual confusion, as set forth in Argument Section I.A.5., infra.

Specifically, around March or April 2007, Celtic Woman Ltd. learned that Browne was intending to replicate the CELTIC WOMAN stage production in Ireland using males as featured performers under the tentative working title CELTIC MAN. At the same time, Celtic Woman Ltd. learned that the Company Register Office ("CRO") in Dublin, Ireland had issued the company name "Celtic Man Ltd." Browne is the Director of Celtic Man Ltd. Kavanagh Decl., ¶¶ 37-38.

On April 4, 2007, Celtic Woman Ltd.'s attorneys in Ireland objected to the formation of Celtic Man Ltd. on the grounds that such name is confusingly similar to Celtic Woman Ltd. and would cause confusion among the general public and suppliers. This letter also informed the CRO that Celtic Woman Ltd. owns the domain name <celticman.com> which is identical to the

11

company name Celtic Man Ltd., and that the Director of Celtic Man Ltd., Browne, was formerly an employee of Celtic Collections Ltd.  Kavanagh Decl., ¶ 39, Ex. 12.

Additionally, from April through June 2007, Celtic Woman Ltd.'s attorneys in Ireland sent several letters to Browne demanding, among other things, that she: (1) not use the name CELTIC MAN for her new stage show or as the name of her company; (2) not use Plaintiff's CELTIC WOMAN trademark to promote any products or services; (3) cease any attempts to associate herself with CELTIC WOMAN; and (4) cancel or transfer various domain names associated with CELTIC MAN.  Kavanagh Decl., ¶¶ 40-42, 44; Exs. 13-15, 19-20.

On June 22, 2007, following Celtic Woman Ltd.'s objection to the registration of Celtic Man Ltd. and the letters referred to above, Browne registered the company name "Celtic Thunder Ltd." with the CRO.  Kavanagh Decl., ¶ 45, Ex. 21.

On July 31, 2007, the United States Patent and Trademark Office ("PTO") issued an Office Action *denying* Defendant Celtic Man Ltd.'s application to register "CELTIC MAN" as a trademark *on the grounds that such mark is confusingly similar to Plaintiff Celtic Woman Ltd.'s registered trademark CELTIC WOMAN for virtually identical entertainment activities and related merchandise.*  Kavanagh Decl., ¶ 46, Ex. 22 (PTO Office Action dated 7/31/07).

On October 3-5, 2007, Kavanagh attended a PBS Development Conference (the "Conference") in Palm Desert, California for the purpose of promoting an upcoming CELTIC WOMAN tour in the United States.  He was accompanied by Jonathan Hochwald and Maggie Seidel of Madstone Productions.  The Conference was attended by 800-900 people, comprised of representatives and television programmers from hundreds of independent PBS stations in the United States and people seeking to sell goods and services to PBS stations.  CELTIC WOMAN

12

had a booth at the Conference operated by Kavanagh, Hochwald, and Seidel.  Kavanagh Decl.,

¶¶ 47-48; Hochwald Decl., ¶¶ 15-16.

At the Conference, Defendant WLIW, an independent PBS station in New York,

distributed a promotional DVD for the CELTIC MAN production (hereinafter, the "CELTIC

MAN Promo Video") and other promotional materials, which advertise an audiovisual

performance of CELTIC MAN scheduled to be aired by WLIW in March 2008.[5]  Kavanagh

Decl., ¶¶ 49, 53; Hochwald Decl., ¶ 17.  A copy of the CELTIC MAN Promo Video is annexed

to the Kavanagh Decl. as Exhibit 23.

The CELTIC MAN Promo Video makes prominent use of the trademark CELTIC

WOMAN in addition to the trademark CELTIC MAN, including an opening screen credit that

recites the following:

Frame 1:                          CELTIC MAN

IN CELTIC THUNDER THE SHOW

Frame 2:                 BROUGHT TO YOU BY WLIW AND PEP

Frame 3:        AND SHARON BROWNE, ORIGINAL CREATOR
AND PRODUCER OF CELTIC WOMAN

Kavanagh Decl., Ex. 23.

The CELTIC MAN name, the CELTIC MAN Promo Video, and other CELTIC MAN

promotional materials distributed at the Conference caused the widespread mistaken belief

among the PBS station delegates in attendance that the CELTIC MAN show was Celtic Woman

Ltd.'s new project.

---

[5] Defendant Gustavo Sagastume is a consultant working with WLIW to promote the CELTIC MAN show. He formerly worked for PBS at its headquarters in Washington, D.C., during which time he worked on the CELTIC WOMAN show with Hochwald.  Hochwald Decl., ¶¶ 27-28.  Defendant Align Entertainment Group LLC has written, designed and issued press releases and promotional materials for the upcoming CELTIC MAN show.

#717019v2

During the Conference, approximately 50 different PBS delegates approached the CELTIC WOMAN booth and made statements to the CELTIC WOMAN representatives such as:

- Do you have any more information on CELTIC MAN?

- We saw the materials for your new show.

- Don't you think the concepts are too close to one another to work?

- Is there going to be a tour with tickets?

- Is it the same kind of music?

- Can we expect the same deal?

- Congratulations on your new show.

Kavanagh Decl., ¶ 50; Hochwald Decl., ¶ 21.

These PBS delegates had the false impression that CELTIC MAN was associated with, sponsored by, or affiliated with CELTIC WOMAN and Celtic Woman Ltd. They had assumed that CELTIC MAN was a "spin-off" of CELTIC WOMAN. Kavanagh Decl., ¶ 51; Hochwald Decl., ¶ 22. When Kavanagh, Hochwald, or Seidel informed the PBS delegates that CELTIC MAN and CELTIC WOMAN were not affiliated, and that they did not know any details about the CELTIC MAN show, the PBS delegates reacted with incredulity and amazement. The PBS delegates said that they could not believe that CELTIC MAN and CELTIC WOMAN were not affiliated because the names were so similar for identical entertainment products and services in the same narrow genre of music. Kavanagh Decl., ¶ 52; Hochwald Decl., ¶ 23. Two PBS delegates said that CELTIC MAN looked like a "rip-off" of CELTIC WOMAN after they were told that CELTIC MAN and CELTIC WOMAN were not affiliated. Hochwald Decl., ¶ 24.

Following the Conference in October 2007, Celtic Woman Ltd. consulted with its attorneys in the United States concerning the events that had occurred at the Conference, and

14

investigated and gathered facts and relevant documents in preparation for potential litigation. In

addition, Celtic Woman Ltd. took various actions to oppose Defendant Celtic Man Ltd.'s

community trademark application for CELTIC MAN in the European Union. Kavanagh Decl., ¶

55.

On November 2, 2007, Plaintiff, through a substantial shareholder, EMI Records, a label

of Capital Records Holding Co., notified Defendant Browne that it would "aggressively act to

protect our interests in the event that your project infringes on the Celtic Woman trademarks, or

if there is any suggestion that Celtic Woman is promoting, presenting, supporting or otherwise

connected to your show." Kavanagh Decl., ¶ 56, Ex. 24 (Email from David D'Urbano to Sharon

Browne dated 11/2/07). In response, on November 4, 2007, Browne assured and represented to

Plaintiff that "there will be no association with Celtic Woman and my new show. Believe it or

not, I want it that way too." Kavanagh Decl. ¶ 56, Ex. 25 (Email from Sharon Browne to David

D'Urbano dated 11/4/07).

In or around November 20, 2007, the Registrar of Companies in Ireland denied Browne's

application to use "Celtic Man Limited" as a company name, and found that the name Celtic

Man Limited would have to be changed so as not to infringe on the rights of Plaintiff Celtic

Woman Limited. Kavanagh Decl. ¶ 57, Ex. 26. ***Accordingly, two government agencies – the

PTO in the United States and the Registrar of Companies in Ireland – have concluded that

CELTIC MAN is confusingly similar to CELTIC WOMAN.***

On December 11, 2007, Browne, reneging on her prior assurance in November that there

would be no association between CELTIC WOMAN and her new show, and ignoring the prior

conclusions of the PTO and the Registrar of Companies that CELTIC MAN and CELTIC

WOMAN were confusingly similar, issued a major press release announcing the CELTIC MAN

15

performing group and stage show entitled "Creator of the Best Selling Irish Musical Phenomenon 'Celtic Woman' Launches Brand New Show." Kavanagh Decl. ¶ 58, Ex. 27. This press release is a flat outright misrepresentation of the origin of CELTIC MAN and of the association of CELTIC MAN to CELTIC WOMAN.

In mid-December 2007, the Defendants placed a full-page advertisement for the CELTIC MAN show in the *Current Newspaper*, a newspaper which has a paid circulation of 5,000 to 6,000 copies and a readership estimated at twice that number, including program buyers, managers, producers, educational specialists, fundraisers and other professionals in public television and radio in the United States, as well as a variety of independent producers, state and federal policymakers, station trustees and others – in other words, the heart of the United States market for the CELTIC WOMAN show. The *Current Newspaper* advertisement prominently and falsely states that the CELTIC MAN show is "from the creator of CELTIC WOMAN." Kavanagh Decl., ¶ 59. A copy of the false advertisement in *Current Newspaper* is annexed to the Kavanagh Decl. as Ex. 28.

Defendant Gustavo Sagastume, who formerly promoted CELTIC WOMAN and is now promoting CELTIC MAN, has begun to actively solicit independent PBS stations (other than Defendant WLIW) to air the CELTIC MAN stage show in the same manner as the PBS stations have presented Plaintiff's CELTIC WOMAN production. Hochwald Decl., ¶¶ 27-29. Moreover, a representative of the CELTIC MAN show has gone so far as to suggest to at least one PBS station that it should broadcast the CELTIC MAN performance immediately following the CELTIC WOMAN performance during the annual pledge drive "because the audience is already there." Hochwald Decl., ¶ 25.

16

Defendants have recently placed a billboard in Times Square advertising their CELTIC MAN show.  Kavanagh Decl., ¶ 62.  A copy of this image from the CELTIC MAN website showing the billboard advertisement is annexed to the Kavanagh Decl. as Exh. 30.

Defendant Browne's "My Space" profile on MySpace.com prominently references CELTIC WOMAN and contains unauthorized CELTIC WOMAN recordings which to visitors to Browne's MySpace page can listen.  Kavanagh Decl. ¶ 61, Ex. 29.

## ARGUMENT

Defendants' name CELTIC MAN is virtually identical to Plaintiff's registered trademark CELTIC WOMAN, and those trademarks are being used in connection with virtually identical entertainment goods and services in the identical narrow genre of traditional music.  Moreover, Defendants' CELTIC MAN show, future tours and related CDs, DVDs, and merchandise will be sold to the same market of consumers as Plaintiff's CELTIC WOMAN show, tours and related CDs, DVDs, and merchandise.  Additionally, CELTIC MAN will be marketed through the same channels of trade as CELTIC WOMAN – PBS television broadcasts, concert venues, the Internet, and retailers.  Defendants' wrongful use of the CELTIC MAN and CELTIC WOMAN marks has already caused enormous actual confusion among the PBS delegates at the Conference.  It is highly likely that the general public as well as booking agents, theaters, arenas, and the press will be similarly misled to believe that CELTIC MAN is sponsored by, affiliated with, or associated with CELTIC WOMAN and Celtic Woman Ltd.  Kavanagh Decl., ¶ 63; Hochwald Decl., ¶ 32.

The likelihood of confusion is made even more certain by Defendants' unauthorized use of Plaintiff's registered trademark CELTIC WOMAN to promote their CELTIC MAN show as they did in the previously-described opening screen credit of the CELTIC MAN Promo Video, the December 11, 2007 press release, the advertisement in the *Current Newspaper*, and on

Browne's "My Space" profile.  Defendants are successfully creating a false association with CELTIC WOMAN as a platform from which to launch its unrelated CELTIC MAN show. Kavanagh Decl., ¶¶ 64-65; Hochwald Decl., ¶¶ 33-34.

Plaintiff has no control over the quality of Defendants' CELTIC MAN show.  As a consequence, the favorable reputation and goodwill that Celtic Woman Ltd. has developed in its valuable CELTIC WOMAN trademark is at risk because it has no control over products and services that the entertainment industry and general public will mistakenly believe to have originated with CELTIC WOMAN.  Defendants' conduct in fraudulently misrepresenting to the general public that is the core market for CELTIC WOMAN that an association exists between CELTIC MAN and CELTIC WOMAN is threatening the reputation and goodwill of CELTIC WOMAN.

A party seeking a preliminary injunction must show (a) irreparable harm if the injunction is not granted, and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly in its favor.  Laureyssens v. Idea Group, Inc., 964 F.2d 131, 135-36 (2d Cir. 1992).  Plaintiff's request for a preliminary injunction is premised on the Lanham Act which protects both registered and unregistered trademarks from infringement, and specifically provides that the federal courts may enjoin infringing activities.  15 U.S.C. § 1116.  Trademark actions, like the present one, are thus "common venues for the issuance of preliminary injunctions."  McDonalds Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998) (quoting Foxworthy v. Custom Tees, Inc., 879 F. Supp. 1200, 1219 (N.D. Ga. 1995)).  As set forth below, Plaintiff is entitled to preliminary relief.

I.    **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADEMARK INFRINGEMENT CLAIMS BASED ON DEFENDANTS' USE OF "CELTIC MAN"**

Plaintiff's claims for Defendants' infringement of its CELTIC WOMAN trademark arise under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114 (registered trademarks) and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) (false designation of origin). Plaintiff's claims are based, in part, on the fact that Defendants' use of CELTIC MAN in connection with their musical stage show is likely to cause consumers to believe that Defendants' show originates with or is sponsored by or affiliated with CELTIC WOMAN or Celtic Woman Ltd. – in other words, that CELTIC MAN and CELTIC WOMAN emanate from the same source.[6]

The legal standard for infringement of federally registered and common law trademarks under the Lanham Act is the same. Virgin Enter. Ltd. v. Nawb, 335 F.3d 141, 146 (2d Cir. 2003); Gruner + Jahr USA Publ'g, A Division of Gruner + Jahr Printing and Publ'g Co. v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993). To prevail on its trademark infringement claims, Plaintiff must show that: (1) its CELTIC WOMAN mark is entitled to trademark protection; and (2) Defendants' use of CELTIC MAN will likely cause confusion with Plaintiff's mark. Gruner, 991 F.2d at 1074. It is highly likely that Plaintiff will succeed on the merits of these claims.

A.    **Plaintiff's CELTIC WOMAN Mark is Entitled to Trademark Protection**

Plaintiff's registration of the CELTIC WOMAN mark on the Principal Register in the PTO constitutes *prima facie* evidence of the ownership and validity of the registered mark and Plaintiff's exclusive right to use the mark on the goods and services specified in the registrations. 15 U.S.C. §§ 1057(b), 1115(a).

---

[6] Plaintiff also claims that Defendants' use of Plaintiff's CELTIC WOMAN trademark to promote their CELTIC MAN show violates the Lanham Act. This claim is separately addressed in Section II infra.

19

Moreover, Plaintiff's CELTIC WOMAN trademark has acquired secondary meaning through Plaintiff's widespread use of the mark in connection with its highly acclaimed musical stage production CELTIC WOMAN and related musical sound recordings, DVDs, televised broadcasts, tours, and other CELTIC WOMAN branded merchandise. See supra Statement of Facts §§ I, III. A trademark acquires secondary meaning when consumers associate such mark with a single, albeit anonymous source. Adjusters Int'l, Inc. v. Public Adjusters Int'l, Inc., 1996 WL 492905 (N.D.N.Y. 1996). A mark may acquire secondary meaning through widespread use, significant advertising expenditures, sales success, unsolicited media coverage and other evidence that shows consumers have come to associate such mark with a single source. Id.

The CELTIC WOMAN mark is entitled to a broad scope of trademark protection.

**B.     There is a Strong Likelihood of Confusion Between Plaintiff's CELTIC WOMAN Mark and Defendants' CELTIC MAN Mark**

In assessing likelihood of confusion for purposes of trademark infringement, the test is whether an appreciable number of ordinary prudent purchasers are likely to be misled or confused as to the source or sponsorship of the goods or services in question. Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d 44, 47 (2d Cir. 1978). In the landmark case of Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961), Judge Friendly outlined the factors to be considered in determining whether use of a mark is likely to cause confusion: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) where the products are dissimilar, the likelihood that the plaintiff will "bridge the gap" by entering the defendant's market; (5) the sophistication of the buyers; (6) actual confusion; (7) the defendant's intent in adopting the mark; and (8) the quality of the defendant's products. Id.

Application of the <u>Polaroid</u> factors is straightforward on the facts of this case and clearly favors Plaintiff.

### 1.   Plaintiff's CELTIC WOMAN Mark is Strong

The evidence in the record leaves no doubt that the CELTIC WOMAN mark is strong and distinctive. The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source. <u>Paddington Corp. v. Attiki Importers & Distributors, Inc.</u>, 996 F.2d 577, 585 (2d Cir. 1993). Trademarks are distinctive if they are either inherently distinctive or have acquired distinctiveness through secondary meaning. <u>Virgin</u>, 335 F.3d at 147.

Plaintiff's CELTIC WOMAN mark has inherent strength or distinctiveness as evidenced by Plaintiff's three United States Trademark Registrations on the Principal Register. Such registrations entitle Plaintiff to the strong presumptions of inherent distinctiveness and validity accorded by the statue. <u>American Home Prods. Corp. v. Johnson Chemical Co.</u>, 589 F.2d 103, 106 (2d Cir. 1978). The strength of the CELTIC WOMAN mark has been further enhanced by the truly extraordinary marketing efforts and success achieved by the CELTIC WOMAN show since its initial debut. For example:

- Three of the CELTIC WOMAN CDs have sold more than 2.3 million copies in the United States. *Celtic Woman* has gone platinum in the United States, and *Celtic Woman: A Christmas Celebration* and *Celtic Woman: A New Journey* each have achieved gold status in the United States. Each of these albums reached number one on the Billboard's World Music Chart, and *Celtic Woman* held the number one position for 81 weeks.

- Three of the CELTIC WOMAN DVDs have sold more than 750,000 copies in the United States.

- The CELTIC WOMAN March 2005 PBS special has aired over 3,400 times on 316 different PBS stations since its debut.

21

- The CELTIC WOMAN PBS TV special entitled *Celtic Woman: A New Journey: Live At Slane Castle* premiered on PBS in December 2006 with more than 90% of all 330 PBS stations broadcasting during PBS's December 2006 pledge period, and set fundraising records for the PBS stations.

- There have been six US tours of the CELTIC WOMAN show with ticket sales in excess of 600,000 and sell-outs of major venues nationwide.

- The performers in the CELTIC WOMAN show have appeared on many television shows with nationwide audiences such as *The Today Show, Live With Regis & Kelly, The Megan Mullaly Show, The Martha Stewart Show* and *Brian Boitano's NBC Skating Spectacular on New Years Day 2007.*

- The performers in the CELTIC WOMAN show performed for President Bush at the White House at a St. Patrick's Day celebration.

- The CELTIC WOMAN website receives an average of 35,000 to 42,000 hits per week and had 215,920 visitors and 1,427,950 "pageviews" in December 2007 alone.

- Plaintiff has sold over 4,500 items of CELTIC WOMAN branded merchandise to consumers in the United States though its CELTIC WOMAN website, not including merchandise sold during tours or through other channels of trade.

- Plaintiff has expended approximately $10 million to produce and promote CELTIC WOMAN tours, television broadcasts, CDs, DVDs, and merchandise.

CELTIC WOMAN is an inherently distinctive strong trademark and, additionally, has acquired secondary meaning.  When there is widespread recognition of a mark among consumers, there is an increased likelihood that "consumers will assume it identifies the previously familiar user," and therefore an "increas[ed] ... likelihood of consumer confusion if the new user is in fact not related to the first."  <u>Virgin</u>, 335 F.3d at 148.  This factor weighs heavily in favor of Plaintiff.

## 2.   **Plaintiff's CELTIC WOMAN Mark and Defendants' CELTIC MAN Mark are Virtually Identical**

In determining whether two marks are confusingly similar, the Lanham Act requires that the allegedly infringing mark be compared with the claimant's mark.  <u>See</u> 15 U.S.C. §§ 1114(1), 1125(a).  The degree of similarity needed to prove likelihood of confusion will vary with the

22

differences in the goods of the parties. <u>Banff, Ltd. v. Federated Dept. Stores, Inc.</u>, 841 F.2d 486, 492 (2d Cir. 1988). Where the goods are directly competitive, as here, the degree of similarity required to prove likelihood of confusion is less than in the case of dissimilar products. <u>Id.</u>

Defendants' CELTIC MAN mark and Plaintiff's CELTIC WOMAN mark are confusingly similar in sound and appearance and create a very similar commercial impression. Both marks are made up of two words; the first word in each mark is CELTIC. The only difference between the marks is the deletion of the letters "WO" from the second word in Defendants' mark. In addition, there is a close inherent association between the names CELTIC WOMAN and CELTIC MAN as they represent a counterpart gender and natural extension of the other. Moreover, the CELTIC WOMAN mark and CELTIC MAN mark are used in connection with identical products and services as described below, all of which gives the impression that the later CELTIC MAN production is the natural extension of the famous CELTIC WOMAN production. <u>See</u> <u>Miss Universe, Inc. v. Pitts</u>, 714 F. Supp. 209 (W.D. La. 1989) (finding Defendant's use of MRS. USA and MRS. UNIVERSE confusingly similar to Plaintiff's MISS USA and MISS UNIVERSE marks); <u>Miss Universe, Inc. v. Miss Teen USA, Inc.</u>, 209 U.S.P.Q. 698 (N.D. Ga. 1980) (finding Defendant's MISS TEEN USA confusingly similar to Plaintiff's MISS USA mark); <u>Miss Universe, Inc. v. Little Miss USA, Inc.</u>, 212 U.S.P.Q. 425 (N.D. Ga. 1981) (finding Defendant's LITTLE MISS USA mark confusingly similar to Plaintiff's MISS USA mark). This factor weighs heavily in favor of Plaintiff.

3.    **The Parties' Goods and Services are Related and Sold Through the Same Channels of Trade**

The parties' respective goods and services are virtually identical and directly competitive. Plaintiff's CELTIC WOMAN musical stage show and related musical sound recordings and DVDs feature five female artists performing Celtic music in a large theatrical setting with an

23

orchestra, choral signers, and complex stage and lighting designs – a setting that distinguishes CELTIC WOMAN from the intimate venues of most vocal performances of traditional Irish music. Defendants' CELTIC MAN show features five male artists similarly performing a mix of traditional and popular music in a large theatrical setting with an orchestra, choral singers, and complex stage and lighting designs – in other words a virtual replica of Plaintiff's production in a male format. Thus, under this factor, there is a strong likelihood of confusion. <u>Banff, Ltd.</u>, 841 F.2d at 492.

The likelihood of confusion is heightened because Plaintiff's and Defendants' shows target the same audience and are being marketing through the same channels of trade – namely, PBS television broadcasts, concert venues, the Internet and retailers. The CELTIC MAN show will make its debut televised performance on an independent PBS station (Defendant WLIW) in March 2008 and, like CELTIC WOMAN, will be accompanied by a series of music CDs, DVDs, tours and merchandise distribution.

This factor weighs heavily in favor of Plaintiff.

### 4.    <u>Plaintiff Already Has Bridged the Gap</u>

Plaintiff and Defendants each produce and promote musical stage performances and related musical sound recordings, videos and merchandise. The products and services on which the competing marks are used are directly competitive. Under <u>Polaroid</u>, there is no gap to be bridged between the products and services of Plaintiff and Defendants. <u>Banff, Ltd.</u>, 841 F.2d at 492. In addition, for a number of years Plaintiff has been discussing the development of a show featuring male musical artists as a natural extension of its CELTIC WOMAN show. On May 26, 2006 and November 2, 2006, respectively, Plaintiff obtained registrations for the domain names <celticman.eu> and <celticman.com>. Additionally, on May 3, 2007, Plaintiff filed four United

24

States trademark applications for the mark CELTIC MAN with the United States Patent and Trademark Office. This factor weighs heavily in favor of Plaintiff.

### 5.    There is Substantial Evidence of Actual Confusion

The best evidence of likelihood of confusion is the occurrence of actual confusion and mistake. "Although evidence of actual confusion is not essential to a finding of trademark infringement, there can be no more positive proof of likelihood of confusion than evidence of actual confusion." Lambda Elec. Corp. v. Lambda Tech. Inc., 211 U.S.P.Q. 75, 86 (S.D.N.Y. 1981) (citing Groytrain, Helfferich, Schulz Th. Steinweg Nachf. v. Steinway & Sons, 365 F.Supp. 707, 715-16 (S.D.N.Y. 1973), aff'd, 523 F.2d 1331 (2d Cir. 1975)); see also Virgin, 335 F.3d at 151 ("It is self evident that the existence of actual consumer confusion indicates a likelihood of confusion.") A plaintiff may prove actual confusion by evidence of specific incidents, and courts have found that even just a few incidents are sufficient to establish the existence of actual confusion. Virgin, 335 F.3d at 151; Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 543 (2d Cir. 1956).

There is substantial evidence of actual customer confusion in the record. During the PBS Conference in October 2007, where Defendants distributed the CELTIC MAN Promo Video, approximately 50 different PBS delegates approached Plaintiff's representatives and made statements such as:

- Do you have any more information on CELTIC MAN?

- We saw the materials for your new show.

- Don't you think the concepts are too close to one another to work?

- Is there going to be a tour with tickets?

- Is it the same kind of music?

- Can we expect the same deal?

25

- Congratulations on your new show.

These PBS delegates had mistakenly assumed that CELTIC MAN was associated with, sponsored by, or affiliated with CELTIC WOMAN and Celtic Woman Ltd. They had assumed that CELTIC MAN was a "spin-off" of CELTIC WOMAN. See supra Statement of Facts § VII.

This factor weighs heavily in favor of Plaintiff.

### 6.    Defendants Adopted the CELTIC MAN Mark in Bad Faith

Defendants' decision to use CELTIC MAN is the epitome of bad faith. Plaintiff acquired all intellectual property rights in the names and concepts CELTIC WOMAN and CELTIC MAN from Defendant Browne in 2004 for the equivalent of $1,036,237.11 United States dollars. Defendant Browne, as an employee of Plaintiff's affiliate Celtic Collections Ltd., and Defendant Gustavo Sagastume formerly worked closely with the Plaintiff to promote CELTIC WOMAN, and thus have intimate knowledge of the fame and importance of the CELTIC WOMAN mark. Moreover, Browne had several conversations with David Kavanagh, the CEO of Plaintiff, while an employee of Celtic Collections Ltd., regarding CELTIC MAN and was present for a meeting between Kavanagh and EMI Music to discuss the future development and commercial exploitation of CELTIC MAN. In addition, Plaintiff has repeatedly told Browne to cease her infringement of the CELTIC WOMAN trademark and to cancel or transfer her CELTIC MAN domain names. See supra Statement of Facts § VII.

Despite all this, Defendants have gone forward using the confusingly similar name CELTIC MAN for their show and using the CELTIC WOMAN trademark to promote it – all with the goal of trading off the name and reputation of CELTIC WOMAN and creating a false association as a platform to launch their new show in the United States. Defendants' egregious conduct is reminiscent of that in another case where Revlon decided to use the mark CUTI-TRIM on manicure implements despite the prior use by the plaintiff of various TRIM marks:

26

Revlon's actions and contentions are surrounded by an aura of indifference to plaintiff's rights and a smug willingness to determine unilaterally that the good will plaintiff has sought to foster could safely be treated as a nullity. These elements amount to a species of bad faith and wrongful intent. The defendant, by duplicating plaintiff's mark, acted in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured.

W.E. Bassett Co. v. Revlon, Inc., 305 F. Supp. 581, 588 (S.D.N.Y. 1969), aff'd in part and rev'd

in part, 435 F.2d 656 (2d Cir. 1970).

There is overwhelming precedent in the Second Circuit that a conscious imitation is bad

faith and creates a presumption that the intended similarity is likely to cause confusion and

irreparable harm. Paddington Corp., 996 F.2d at 586 (holding where a second-comer acts in bad

faith and intentionally copies a trademark, a presumption arises that the copier has succeeded in

causing confusion); Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir.

1987) (finding that intentional copying gives rise to a presumption of a likelihood of confusion);

Harlequin Enters. Ltd. v. Gulf & Western Corp., 644 F.2d 946, 949 (2d Cir. 1981) (evidence of

conscious imitation presumes that an intended similarity is likely to cause confusion); Bear

U.S.A., Inc. v. Kim, 71 F. Supp. 2d 237, 254 (S.D.N.Y. 1999) (finding that an intention to

confuse and capitalize on plaintiff's good will gives rise to a presumption of likelihood of

confusion); Schweitzz Dist. Co. v. P & K Trading, Inc., No. 93 CV 4785(NG), 1998 WL

472505, at *3 (E.D.N.Y. July 16, 1998) (holding where there is substantial evidence that the

defendant intentionally copied the plaintiff's mark, it gives rise to a powerful inference that

confusion is likely); Adjusters Int'l, Inc., 1996 WL 492905, at *12 (intentional copying may be

inferred where competitors are selling identical products in the same market under a substantially

similar mark).

Further, the junior user's continued use of a mark after the United States Patent and

Trademark Office has refused registration based upon the senior user's own registration is

27

indicative of bad faith. <u>Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.</u>, 411 F.2d 1097,

1101 (2d Cir. 1969) (finding bad faith where defendant persisted in its use of allegedly infringing

mark in spite of the Patent Office's denial of its application to register the mark on the grounds

of likelihood of confusion with plaintiff's mark). Indeed, that is exactly what happened here –

the PTO denied Defendant Celtic Man Ltd.'s application to register CELTIC MAN as a

trademark on the grounds that it is confusingly similar to Plaintiff's registered trademark

CELTIC WOMAN for virtually identical entertainment products. <u>See</u> <u>supra</u> Statement of Facts §

VII. The Registrar of Companies in Ireland also denied Browne's application to use "Celtic Man

Limited" as a company name on the same grounds. <u>Id.</u>

    This factor weighs heavily in favor of Plaintiff.

## 7.    The Quality of Defendants' Products is Outside Plaintiff's Control

    The high quality of CELTIC WOMAN has been firmly established; on the other hand,

the quality of CELTIC MAN is unknown. Plaintiff clearly has no control over the quality of

CELTIC MAN, although such control is at the heart of a trademark owner's rights and

obligations. It is well established that Plaintiff should not be required to bear the risk of damage

to its goodwill that would occur if Defendants' stage show is unsatisfactory to consumers.

<u>Power Test Petroleum Distrib., Inc. v. Calcu Gas, Inc.</u>, 754 F.2d 91, 95 (2d Cir. 1985). This

factor weighs heavily in favor of Plaintiff.

## 8.    Sophisticated and Unsophisticated Buyers are Likely to be Deceived

    The buyers of Plaintiff's and Defendants' respective products and services include the

general public, as well as booking agents, theaters, arenas, and PBS stations that broadcast the

shows. These groups of consumers represent a broad cross-section of society. Many of them are

relatively unsophisticated and easily vulnerable to being confused, misled, and deceived by

advertisements for or productions of the CELTIC MAN show. ***Moreover, even sophisticated***

28

*consumers – like PBS television station representatives – were confused and deceived by*

*Defendants' use of CELTIC MAN, believing that it originated with or was sponsored by the*

*Plaintiff.* Thus, sophisticated and unsophisticated buyers are equally likely to be deceived. This

factor weighs heavily in favor of Plaintiff.

9. **A Likelihood of Confusion Exists Based on the <u>Polaroid</u> Factors and Clear Precedent**

The <u>Polaroid</u> factors discussed above point inexorably to a likelihood of confusion. Not

one factor favors the Defendants. Moreover, two government agencies – the PTO in the United

States and the Registrar of Companies in Ireland – have concluded that CELTIC MAN is

confusingly similar to CELTIC WOMAN. The Second Circuit long ago stated that it is

"required to accept the findings of the Patent Office" on the issue of likelihood of confusion,

"unless the evidence to the contrary is altogether convincing . . . ." <u>Yale Elec. Corp. v.</u>

<u>Robertson</u>, 26 F.2d 972, 973 (2d Cir. 1928).

Courts have found a likelihood of confusion in cases involving facts similar to those here.

For example, in <u>Miss Universe, Inc. v. Pitts</u>, 714 F. Supp. 209 (W.D. La. 1989), the district court

held that the plaintiff's trademarks MISS UNIVERSE, MISS USA, and MISS [STATE] USA

were infringed by defendants' use of the similar names MRS. UNIVERSE, MRS. USA, and

MRS. [STATE OR LOCALITY] USA, and granted plaintiff's motion for a preliminary

injunction. In particular, the court found that "defendants' MRS. USA and MRS. UNIVERSE

marks are substantially similar to plaintiff's MISS USA and MISS UNIVERSE, both visually

and in the way they sound." <u>Id.</u> at 214. The court's reasoning is directly applicable here:

> Similarity of design is determined on the basis of the *total effect* of the
> designation, rather than on a comparison of individual features . . . . Absolute
> identity is not required in order to establish an infringement . . . . Clearly,
> plaintiff's and defendants' marks are not identical; they are, nonetheless, similar.
> Indeed, the only distinguishing feature is the change from the letter "i" in MISS to
> the letter "r" in MRS. and the addition of the period after the abbreviation, MRS.

29

Id. (emphasis added).  As in this case, there also was a similarity between the plaintiff's and the defendants' products (beauty pageants), the target audience for those products (spectators and advertisers), and the respective channels of advertising (media outlets).  Id. at 214-15. Additionally, the defendants had adopted theirs marks with full knowledge of the plaintiff's similar marks, which permitted an inference of wrongful intent.  As here, the plaintiff had advised the defendants that their marks were infringing, and the defendants had used plaintiff's MISS UNIVERSE trademark on one of their pageant booklets.  Id. at 215-16.  Lastly, there was evidence of actual confusion where people believed that defendants' pageant was affiliated with the plaintiff's pageant.  Id. at 216.

All the same factors are present here – visual and phonetic similarity between the Plaintiff's CELTIC WOMAN and Defendants' CELTIC MAN marks; virtually identical products, markets, and channels of trade; wrongful intent by the Defendants; and evidence of actual confusion.

A likelihood of confusion similarly was found in Miss Universe, Inc. v. Miss Teen U.S.A., Inc., 209 U.S.P.Q. 698 (N.D. Ga. 1980), where the court held that defendant's mark MISS TEEN U.S.A. infringed plaintiff's mark MISS U.S.A.  Confusion existed even though the two marks were not identical:

> [T]he likelihood of confusion does not stem from the possibility that the typical consumer may mistake the defendant's services for those of the plaintiff; the danger lies in the real probability that this same consumer may associate the defendant with the plaintiff . . . . It is quite reasonable to assume that the defendant's "Miss Teen U.S.A." pageant is an offshoot of the plaintiff's "Miss U.S.A." pageant, simply a warm-up for teenage girls in preparation for the contest for young women . . . . Of those members of the defendant corporation primarily responsible for selecting a name for their pageant, all were aware of the plaintiff's organization and its public standing beforehand.

#717019v2

Id. at 709; see also Miss Universe, 212 U.S.P.Q. 425 (concluding that "ordinary purchasers are likely to confuse the defendant' mark LITTLE MISS U.S.A. with the plaintiff's mark MISS U.S.A.).

Accordingly, Plaintiff has demonstrated a likelihood of success on the merits of its claim that Defendants' use of CELTIC MAN infringes Plaintiff's trademark CELTIC WOMAN in violation of 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a).

II.    **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADEMARK INFRINGEMENT CLAIMS BASED ON DEFENDANTS' UNAUTHORIZED USE OF PLAINTIFF'S "CELTIC WOMAN" TRADEMARK TO PROMOTE THEIR "CELTIC MAN" SHOW**

As set forth above, Defendants' use of CELTIC MAN in conjunction with their new show is, in and of itself, likely to cause confusion. However, the likelihood of confusion is made even more certain by Defendants' unauthorized use of Plaintiff's registered trademark CELTIC WOMAN to promote their CELTIC MAN show as they did in the opening screen credit of the CELTIC MAN Promo Video, the December 11, 2007 press release, the advertisement in the *Current Newspaper*, and on Browne's "My Space" profile. See supra Statement of Facts § VII.

Defendants' unauthorized use of CELTIC WOMAN in advertising and press releases is a blatant attempt to trade off the name and reputation of CELTIC WOMAN and create a false association as a platform to launch their new CELTIC MAN show in the United States. It cannot possibly constitute a fair use.

The case of Brother Records, Inc. v Jardin, 318 F.3d 900 (9th Cir. 2005) is directly on point. In that case, the defendant claimed that its use of plaintiff's "Beach Boys" trademark was a fair use. The Ninth Circuit disagreed:

> Jardine's promotional materials display "The Beach Boys" more prominently and boldly than "Family and Friends," suggesting sponsorship by the Beach Boys .... Also, there is evidence that Jardine uses "The Beach Boy" trademark to suggest that his band is in fact sponsored by the Beach Boys, as Jardine's management

> testified that they recommended including the trademark "The Beach Boys" in the
> name of Jardine's band in order to create or enhance marquee value. Finally,
> Jardine's use of the trademark caused actual consumer confusion, as both event
> organizers that booked Jardine's band and people who attended Jardine's shows
> submitted declarations expressing confusion about who was performing. Because
> Jardine's use of the trademark suggested sponsorship or endorsement by the
> trademark holder, Jardine's nominative fair use argument fails.

Id. Browne is using the CELTIC WOMAN mark boldly and prominently and in a calculated

manner to suggest that CELTIC MAN is sponsored by or affiliated with CELTIC WOMAN, and

this misuse has already caused enormous actual confusion. Defendants cannot hide behind the

fair use doctrine.

Plaintiff therefore is likely to succeed in showing that Defendants' misuse of its CELTIC

WOMAN trademark without authorization to promote their new show violates 15 U.S.C. § 1114

and 15 U.S.C. § 1125(a).[7]

## III.  PLAINTIFF WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS DENIED

The threat to Plaintiff's goodwill arising from Defendants' use of the confusingly similar

name and mark CELTIC MAN, and Defendants' unauthorized use of Plaintiff's CELTIC

WOMAN mark to promote their new CELTIC MAN show constitutes irreparable injury

justifying issuance of a preliminary injunction. Trademark infringement, by its very nature,

necessarily causes irreparable harm which cannot be adequately compensated by money

damages. Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704, 708 (2d Cir.

1982); American Home Prods. Corp. v. Johnson Chemical Co., 589 F.2d 103, 106 (2d Cir.

1978). Accordingly, once likelihood of success is shown on an infringement claim, irreparable

injury is presumed as a matter of law.  Power Test Petroleum Distributors v. Calcu Gas, 754 F.2d

91, 95 (2d Cir. 1985). Plaintiff has demonstrated a likelihood of success on each of its claims.

---

[7] Defendants' infringement of Plaintiff's CELTIC WOMAN mark also violates New York state trademark
and unfair competition law.

#717019v2

Accordingly, injunctive relief is not only appropriate, but indeed essential, to protect Plaintiff's valuable rights.

Even without this presumption, Plaintiff is suffering irreparable harm. A party may demonstrate "irreparable injury" where it shows that it will lose control of its reputation and good will by another's use of its mark. <u>Power Test Petroleum</u>, 754 F.2d at 95 (irreparable harm exists in a trademark case when the moving party "shows that it will lose control over the reputation of its trademark pending trial."). That loss of control is occurring here.

Defendant WLIW is scheduled to broadcast the debut of the CELTIC MAN show in the United States in March 2008. In the meantime, Defendants are issuing press releases and advertisements for that broadcast, distributing promotional materials and videos, and trying to convince other PBS stations to air the CELTIC MAN show. Plaintiff has no control over the quality of Defendants' CELTIC MAN show. As a consequence, the favorable reputation and goodwill that Celtic Woman Ltd. has developed in its valuable CELTIC WOMAN trademark is at risk because it now depends on the success or failure of the CELTIC MAN show with which it has no affiliation. Plaintiff will be irreparably harmed if Defendants produce and distribute an inferior stage show, tour, related audio and visual recordings, and merchandise in connection with a confusingly similar name or trademark.

Money damages cannot wholly compensate Plaintiff because its injuries involve incalculable harm to Plaintiff's good will, reputation, and relationship with present and prospective consumers of its CELTIC WOMAN show and related products.

## IV.    THE BALANCE OF HARDSHIPS WEIGH HEAVILY IN FAVOR OF THE PLAINTIFF

The balance of hardships clearly favors Plaintiff. The CELTIC WOMAN trademark is recognized by millions of people and has achieved fame and secondary meaning in the United

33

States as a source of high quality and unique entertainment. It is a source of immeasurable value to the Plaintiff. Moreover, the enormous success of CELTIC WOMAN resulted from a huge expenditure of time and money by Plaintiff -- approximately $10 million to produce and promote CELTIC WOMAN tours, television broadcasts, CDs, DVDs, and merchandise over the last three years (as well as over $1 million to buy the CELTIC WOMAN concept from Browne in 2004). CELTIC WOMAN is extremely well-established in the marketplace and in the minds of consumers.

By contrast, the CELTIC MAN show is entirely new to the United States and the rest of the world. It has no audience or fan-base whatsoever. Unlike CELTIC WOMAN, there have been no CDs or DVDs of CELTIC MAN released or sold anywhere in the United States, no CELTIC MAN live shows or tours, and no television broadcasts of CELTIC MAN. Accordingly, Defendants will suffer little or no harm if enjoined from using CELTIC MAN as a trademark or trade name.

Moreover, Defendants unquestionably knew of Plaintiff's rights in CELTIC WOMAN long before their adoption of the virtually identical mark. The law is clear that "the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." Boston Athletic Ass'n v. Sullivan, 867 F.2d 22 (2d Cir. 1980). Defendants Browne and Sagastume formerly worked closely with the Plaintiff to promote CELTIC WOMAN, and thus have intimate knowledge of the fame and importance of that mark. In addition, Plaintiff repeatedly told Browne to cease her infringement of the CELTIC WOMAN trademark and to cancel or transfer her CELTIC MAN domain names. Despite this, Defendants have gone forward -- using the confusingly similar name CELTIC MAN for their show and using the CELTIC WOMAN trademark to promote it -- all with the

34

goal of trading off the name and reputation of CELTIC WOMAN and creating a false association as a platform to launch their new show in the United States.

Any claim that Defendants will be inconvenienced by having to make a name change should be flatly rejected and, at any rate, is far outweighed by the harm to Plaintiff if the requested injunction is denied.

## CONCLUSION

For the foregoing reasons. Plaintiff respectfully requests that the Court grant its motion for a preliminary injunction.

Dated:    New York, New York
          January 10, 2008

                                 Respectfully submitted,

                                 CELTIC WOMAN LTD.

                                 By its attorneys,

                                 _____
                                 Peter A. Herbert (PH-2581)
                                 Deborah L. Benson
                                 Eric D. Levin
                                 Amy B. Spagnole
                                 Hinckley, Allen & Snyder LLP
                                 28 State Street
                                 Boston, MA 02109
                                 Tel: (617) 345-9000
                                 Fax: (617) 345-9020

                                 Richard S. Mandel (RM-4884)
                                 Cowan, Liebowitz & Latman, P.C.
                                 1133 Avenue of the Americas
                                 New York, NY 10036
                                 Tel: (212) 790-9200
                                 Fax: (212) 575-0671

35

#717019v2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2008, I caused a true and correct copy of the foregoing Plaintiff Celtic Woman Ltd.'s Motion for Preliminary Injunction, Declaration of David Kavanagh with accompanying exhibits, Declaration of Jonathan Hochwald, and Declaration of Peter Herbert to be served upon Defendant via hand delivery addressed as follows:

        WLIW, LLC
        450 West 33rd Street
        New York, N.Y.  10001

_____
        Richard S. Mandel

27891/000/816212.1